IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL LEOPOLD,<br><br>                 Petitioner,<br><br>v.<br><br>C. A. TERHUNE, Warden,<br><br>                 Respondent.<br>_____ | No. C 01-4217 SBA (PR)<br><br>**ORDER DENYING PETITION<br>FOR WRIT OF HABEAS<br>CORPUS** |

**INTRODUCTION**

      This matter is now before the Court for consideration of Carl Leopold's (hereinafter "Petitioner") pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 concerning his 1998 conviction in Alameda County Superior Court.  Warden C. A. Terhune (hereinafter "Respondent") opposes the petition.  Petitioner filed a traverse.  For the reasons discussed below, the petition will be DENIED.

**BACKGROUND**

**I.**    **Case History**

      Petitioner was convicted in the Alameda County Superior Court for murder with special circumstances, attempted murder, and robbery.  He was sentenced to life without parole, plus thirty-two years in prison.  On May 31, 2000, the state appellate court affirmed Petitioner's conviction and sentence.  On August 30, 2000, the California Supreme Court denied his petition for review.

      On November 13, 2001, Petitioner filed his federal petition for a writ of habeas corpus. At the time Petitioner filed his original petition, he was represented by counsel.  Petitioner asserted one claim in his original petition, and he promptly requested a stay of these proceedings to permit him to return to state court to exhaust additional claims.  The Court granted the motion to stay proceedings, and Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court on July 11, 2002.  On April 30, 2003, the California Supreme Court rejected

Petitioner's additional claims.[1]

On May 14, 2003, Petitioner's counsel withdrew from his representation of Petitioner. The following day, Petitioner requested that the Court appoint counsel to represent him at public expense. The Court denied Petitioner's Motion for Appointment of Counsel in an Order dated December 17, 2003 and granted Petitioner's request for an extension to file an amended petition.

Petitioner prepared his amended petition without professional assistance and filed it on April 7, 2004. On April 23, 2004, the Court issued an Order upon reviewing Petitioner's first amended petition. In that Order, the Court stated that Petitioner's original petition, which was prepared by an attorney, identified several claims he expected to present in a habeas petition to the state courts and then add to his federal petition by way of amendment. In his first amended petition, Petitioner asserted only two claims for relief. Because Petitioner did not assert any of the other potential claims that were identified in his original petition, the Court provided Petitioner an opportunity to file a second amended petition to include these additional claims.

On May 25, 2004, Petitioner filed his second amended federal habeas corpus petition. As grounds for federal habeas relief, Petitioner raised three claims, each asserting federal grounds for relief and each allegedly exhausted in his petition for review and petition for writ of habeas corpus in the California Supreme Court. Petitioner alleged:

> (1)    that his due process rights were violated when the trial court admitted the guilty pleas of his two co-defendants, even though only one of those co-defendants testified at trial;[2]

---

[1] The Court eventually lifted the stay of Petitioner's federal proceedings. (See Order Lifting Stay nunc pro tunc to May 15, 2003, dated Apr. 23, 2004 at 4.)

[2] Petitioner's second amended petition did not assert a related claim that his due process rights were also violated under the Confrontation Clause, which he now raises for the first time in his Traverse. (Traverse at 3.) However, Petitioner's memorandum of points and authorities attached to his original petition, which was prepared by an attorney, asserted this Confrontation Clause violation claim. (See Orig. Pet. at 16.) A Petitioner may not raise new issues in a traverse. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994). However, the Court will consider the Confrontation Clause violation claim on the merits and ignore the procedural deficiencies of this claim. See infra Discussion Part II.A.3.

2

United States District Court
For the Northern District of California

     (2)    that the appellate court's order "precluded Petitioner from obtaining a complete trial record solely because Petitioner was too poor violated Petitioner's federal and state constitutional rights to due process, equal protection and . . . effective assistance of counsel;" and

     (3)    ineffective assistance of his trial and appellate counsels, in violation of the Sixth and Fourteenth Amendments.

(Second Am. Pet. at 6-7.)

     On May 18, 2005, the Court issued an Order to Show Cause directing Respondent to file an answer to Petitioner's Second Amended Complaint.

     Respondent filed his Answer and Memorandum of Points and Authorities in Support of Answer to Petition for Writ of Habeas Corpus (hereinafter "Answer") on July 11, 2005 (docket nos. 30, 31). Petitioner filed his Traverse on November 28, 2005 (docket no. 35). The matter has been fully briefed and is now ready for review on the merits.

**II.   Facts**

     The following facts are drawn from the appellate opinion.

     On November 30, 1996, James Velez and appellant Carl Edward Leopold -- then 22 years old -- obtained two weapons from Robert Tung -- an Israeli .357 revolver and a shotgun. Leopold took the revolver and Velez took the shotgun. Velez, who did most of the talking, spoke of, "ripping . . . off" a marijuana dealer with a third party -- an inside man -- who was setting up the robbery. Leopold added that they would "slap his punk ass around." Tung asked if they were concerned about their target calling the police. Velez said that he was a dope dealer who had been "ripped off" before.

     The following day in a Newark parking lot, a masked gunman and an accomplice robbed Roberto Araica and Raj Birdi at gunpoint of a black plastic garbage bag containing $5,000 worth of marijuana. The gunman -- a well-muscled, tall African-American[3] male who wore a blue cotton ski mask and a white shirt and who carried a shiny silver revolver -- demanded Birdi's money. Birdi handed over about $40. He saw the accomplice -- later identified as Edgar Detrinidad -- toss a black plastic bag from Araica's van to the gunman. Birdi did not see Detrinidad with a weapon. The gunman shot five times at both men,

---

[3] The record indicates that Leopold was African-American and that Velez and Detrinidad were both Hispanic. Leopold testified that he was over 6 feet tall and weighed 240-245 pounds. He estimated that Velez was about 6 feet tall, weighing 175-180 pounds. He guessed that Detrinidad weighed 145 and was 5 feet 9 inches tall.

3

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

striking Araica in the head and killing him.  Birdi was injured when he was shot three times -- once in the head and twice in the back.

Birdi told police that the masked gunman was a Black male carrying a silver revolver.  Police recovered a pager from Araica's body at the crime scene. It had beeped several times while police were investigating the scene.  An officer seized the pager and recorded all the calls -- numbers and times -- that were contained in it.  One of those numbers also appeared on a scrap of paper in Araica's vehicle, along with the name "Edgar."  The same number appeared next to the name "Edgar" in Araica's address book which was later recovered from his room.  Araica's vehicle smelled strongly of marijuana and marijuana was found inside it.  Detrinidad's fingerprints were found on a van at the scene of the killing. A cell phone found at the scene of the killing contained a telephone number in its memory that was registered to a subscriber named Detrinidad.  Police also received information that the accomplice -- whom the gunman addressed as "Eggert" -- might be Edgar Detrinidad, whose car was similar to the one that the perpetrators drove.

On the afternoon of December 1, 1996, Detrinidad, Velez and Leopold gave several items -- among them a .357 stainless steel Ruger revolver, the shotgun that Velez had borrowed the day before, Leopold's white thermal shirt and Detrinidad's pager -- to Tung, asking him to hide these items.  Velez handed the revolver to Leopold, who turned it over to Tung.  He recognized the .357 as a weapon that belonged to Velez.  He opened the cylinder of the .357 and saw that all the rounds had been fired.  Leopold said that the gun had been used for target-practice the day before.  He asked Tung to get rid of the gun.  During this meeting, Leopold held a black garbage bag that smelled of marijuana.  When the bag was emptied out, it contained baggies of marijuana.  Detrinidad was concerned that "they" had his pager number.  Later, Tung wiped down the .357 to clean off any of his fingerprints that might have been on it and hid the weapon. He also removed the shell casings from the .357[.]

On December 2, 1996, police obtained a Department of Motor Vehicles photograph of Detrinidad and prepared a photographic lineup.  Birdi identified Detrinidad as the gunman's accomplice.  He was unable to identify Leopold as the gunman in a photographic lineup.

On the basis of the evidence that they had gathered, the police obtained arrest and search warrants for Detrinidad, his residence and vehicle.  On December 4, 1996, Detrinidad was arrested.  An address book belonging to Detrinidad that was found at his home listed Velez but not Leopold.  Detrinidad's vehicle -- one matching Birdi's description of the car at the crime scene -- was very clean.

In the course of their investigation, police learned that the perpetrators may have visited Tung on the afternoon of the killing.  On December 5, 1996,

4

police arrested Tung at his residence, charging him with robbery and murder. Pursuant to a warrant, they searched Tung's San Leandro home, seizing an empty .357 Ruger revolver, a blue ski mask, a freshly washed white shirt from the dryer, a pager, and .357-millimeter shell casings -- five spent and one live round. The .357 Ruger revolver was later determined to be the weapon from which a .357-caliber bullet retrieved from Araica's head was fired. When they questioned Tung, the police mentioned Leopold, Detrinidad and Velez by name.

Police also obtained a warrant to arrest Velez and search his residence on December 5, 1996. Velez was arrested and a search of his home turned up .357 ammunition and a black plastic garbage bag with fingerprints of all three men on it.

On December 6, 1996, police obtained a warrant to arrest Leopold and to search his home. Before police could locate Leopold, they executed the search warrant on December 7, 1996. A search of the home he shared with his parents turned up marijuana and paraphernalia in his mother's room, but none in his bedroom. Leopold turned himself in to police and was arrested on December 11, 1996.

On January 9, 1997, Birdi identified Leopold in a physical lineup as the masked gunman. At the lineup, each of six men wore a ski mask and uttered words Birdi recalled the gunman saying during the shooting incident. Birdi told police that he was certain about his identification. Leopold -- who was represented by counsel at the lineup -- chose the other five men to participate in the lineup from a pool of about 90 jail inmates.

In October 1997, Leopold, Detrinidad and Velez were charged with murder, attempted murder and robbery. The information alleged that Leopold was the gunman and that Detrinidad and Velez were his accomplices. As to Leopold, the murder charge carried with it special circumstances allegations for lying in wait and killing in the commission of robbery, an allegation of firearm use, and a great bodily injury enhancement allegation. As to Detrinidad and Velez, the murder charges also alleged the same two special circumstances[4] and allegations of being armed with a firearm. The attempted murder and robbery charges against Leopold were also enhanced by allegations that he used a firearm and inflicted great bodily injury. Detrinidad and Velez were alleged to have been armed with firearms during the commission of these two offenses. (See Pen. Code,[5] §§ 187, 190.2, subd. (a)(15), (17)(a), 211, 664, 12022, subd. (a)(1), 12022.5, 12022.7, subd. (a).) The prosecution opted not to seek the death penalty against any of the three defendants.

Leopold moved to sever his trial from that of Detrinidad and Velez. He

---

[4] The trial court dismissed the lying-in-wait special circumstance alleged against Velez.

[5] All statutory references are to the California Penal Code.

5

argued that the evidence against Detrinidad and Velez was strong while that against him was weak.  He also contended that Velez could exonerate him by testifying that Detrinidad had told him that he was the gunman.  The trial court denied the motion.[6]

Tung and Birdi testified for the prosecution.  Birdi was unable to identify Leopold either at the preliminary hearing or at trial, but he testified about his identification of Leopold at the physical lineup.[7]  He also told the jury that Leopold appeared to be physically similar to the gunman.  Birdi identified Detrinidad as the gunman's accomplice, both in a photographic identification and at trial.  No physical evidence found on the ski mask seized from Tung's residence or recovered at the crime scene -- no fingerprints, blood, hair or fibers -- linked Leopold to the crime.[8]

On the twenty-third day of trial, Detrinidad and Velez withdrew their pleas of not guilty.  They pled guilty to voluntary manslaughter and robbery and admitted various enhancements in exchange for a promise of a maximum 16-year sentence.  Velez and Detrinidad stated that they would testify for the prosecution, but that if Leopold called them as witnesses, they would refuse to testify pursuant to the privilege against self-incrimination.

Leopold moved for a mistrial, arguing that the prosecution had used its superior resources to achieve an inappropriate tactical advantage over him.  His counsel argued that he made tactical decisions based on the co-defendants' presence in the trial -- decisions he would have made differently if he had been tried alone.  In order for Leopold to receive a fair trial, defense counsel argued, it should be before a different jury.  The motion was denied.  Leopold's motion for a two-day continuance was granted.

When the trial resumed, the prosecution called its final witness, Edgar Detrinidad.  Detrinidad told the jury that both he and Velez had pled guilty to some of the charges that would result in 16-year sentences with the possibility of parole,[9] after hearing the evidence against them.  In exchange, he promised to

---

[6]  Leopold does not challenge this ruling on appeal, stating that the trial court's decision was a reasonable exercise of its discretion based on the facts and circumstances known to the court at the time that it made its ruling.

[7]  Leopold's pretrial motion to suppress Birdi's identification as unduly suggestive was denied.

[8]  This statement of facts relies solely on evidence put before the jury before Detrinidad and Velez pled guilty.

[9]  Detrinidad was 20 years old at the time of the killing.  If he had not entered his plea agreement, it was possible that he would have been sentenced to life imprisonment without possibility of parole.

6

testify truthfully for the prosecution. Detrinidad testified that he met Leopold through his friend James Velez. He knew that his friend Roberto Araica had been robbed of his marijuana shipment in the past. Araica told Detrinidad that he did not pursue the thief, but wrote off his loss as part of his cost of doing business. By December 1, 1996, Detrinidad had concocted a plan to lure Araica to a secluded location and steal his marijuana, with the help of Velez and Leopold. The three men planned for Leopold -- the largest of the three -- to be the intimidator. Velez came up with the idea that Leopold could hide inside the trunk of Detrinidad's car.

Detrinidad told the jury that he made the arrangements to meet with Araica in order to buy a large quantity of marijuana. The three men drove to a Fremont parking lot in two cars. Velez carried a shotgun; Leopold held a chrome .357 magnum. Leopold hid in the trunk of Detrinidad's car with the .357 revolver.

Araica and Raj Birdi arrived in a van. In his car, Detrinidad led the van to another parking lot to transact business. Velez's car was not there. Araica brought out a black garbage bag containing 16 one-ounce baggies of marijuana. He wanted $5,000 for this contraband. Detrinidad left Araica and went back to his car, telling him he was going to get the money. Instead, he signaled Leopold that he was ready and popped open the latch on the trunk.

Leopold, wearing a blue ski mask and carrying the chrome .357, got out of the trunk. After Leopold told Detrinidad to check Birdi for cash, Birdi handed his cash over to Detrinidad. Araica tossed a garbage bag of marijuana out of his van. Araica and Birdi lay facedown on the ground, with Leopold standing behind them with the gun. Leopold called Detrinidad by name and told him to get the car. Detrinidad pulled his car closer to Leopold, stopped it and moved to retrieve a backpack in the car. As he faced away from Birdi, Araica and Leopold, he heard as many of five gunshots. He turned toward the sound of the first shot and saw Araica's body jerk. A pool of blood formed out of Araica's head. Leopold was still standing over the two men pointing the gun at them.

Leopold had the bag of marijuana in the other hand. After the shots were fired, Velez drove into the lot in his vehicle. Leopold entered Detrinidad's car with both items and Velez -- in his own vehicle -- led them to Tung's house. The three men took the marijuana and the gun into the house. Detrinidad called his girlfriend and asked her to say that he was with her that day if anyone asked. When he left Tung's house, Detrinidad went home, took a shower, and asked his brother to have his car washed.

When he was arrested, Detrinidad told police several stories. He tried to minimize his role in the shooting. When he learned the consequences facing him, he told police what really happened, naming Velez and "Carl" as his cohorts. They had never planned that Araica would be killed.

7

United States District Court

For the Northern District of California

On cross-examination, Leopold brought out the fact that physical evidence linked Detrinidad and Velez to the scene of the crime. He suggested that Detrinidad and his friend Velez -- whose gun was used in the shooting -- agreed not to blame each other, but to blame Leopold instead. Detrinidad admitted that he told police that Leopold was wearing black clothing -- while he himself was dressed in white clothes -- on the day of the shooting. Before the jury, Detrinidad testified that he remembered Leopold dressed in dark clothing on that day.

Leopold asked Detrinidad about a letter that he had sent to Leopold while Detrinidad was in custody.[10] Detrinidad told the jury that he wrote this letter because some gang members in jail heard a rumor that he had "snitched" on Leopold. One rumor was that Detrinidad had actually been the gunman. A friend of Leopold's in jail told Detrinidad that if he "handled" the situation well, he would not suffer adverse consequences from his act. Because Detrinidad took his advice, the other inmate protected him from harm. However, Detrinidad was still anxious about the possibility of retaliation for telling the truth in court because he now had a "snitch jacket." Part of his plea agreement was that he sought out-of-state custody. After Detrinidad testified, the prosecution rested.

Leopold testified in his own defense. He told the jury that Velez owned the chrome Ruger revolver that was in evidence. He saw Velez on November 30,

_____

[10] The jury heard the text of the letter as follows:

Carl, check this out. I should have got . . . you a long time ago about this. Look, I know I messed up by doing what I did by involving everyone. I didn't know any better. I never been in that position in my life. I didn't know what to do. I was under so much pressure. I seek [sic] help from J. V. a couple days before I got arrested but he didn't answer his door. He was home because I called him from a cellular phone five blocks from his home. When I arrived he didn't answer. I knew all of this was coming back to me and when I asked what to do if I got caught . . . , nobody helped! [¶] Due to all of this, I have lost everything in my life. My family respect, lady, friends and etc. The only thing I have left is my dignity. Whatever that is worth. They want me to talk, but I won't do it. There is no need for all of us to fall. If I don't talk there is no way for conviction on your behalf. James's case is weak as well. I know what I have to do and that is by keeping my mouth shut. Bottom line is this. My life is in your hand and your life is in mine. Do you understand? [¶] Above [sic] all this talking about our case to anyone, I haven't done so. James is the one spreading shit around. I've had to fight 3 times over his punk mouth. Believe that! This shit is too . . . serious to talk to anyone about. You have my word that nothing is going to be said. [¶] I've talked to Bigg Mike and some of my comrades when you sent that letter. They have known that I going [sic] to stay solid. [¶] We need to stop acting like nothing is going on between us. We need to come together somehow. I'm not saying that I need you as my friend, just realize what type of position we are in. [¶] Again, for what this is worth I apologize to you and your family for all of the pain that I have caused. Get back at me! Stay strong and stand tall!

8

United States District Court

For the Northern District of California

1996, when they went to Tung's house.  Velez took two guns with him when he left -- a shotgun and a handgun.  He saw Velez the next day -- December 1, 1996 -- at the latter's home.  Detrinidad arrived at Velez's house later.  Velez and Detrinidad stepped outside and had a conversation; Leopold stayed inside watching television.  Leopold did not hear the content of their conversation. Velez returned to the house, asking to borrow Leopold's car so Detrinidad and Velez could purchase some marijuana.  The three of them went together, with Velez driving Leopold's car and Detrinidad driving his own vehicle.

Leopold told the jury that Velez pulled his car into a commercial parking lot.  Waiting for Detrinidad to arrive, Leopold -- reclining in the passenger seat -- saw the top of a van nearby.  Velez got out of the car and approached the van, which was partially hidden from Leopold's view by some shrubs.  Waiting in the car, Leopold heard multiple gunshots and saw Velez return.  Leopold asked Velez what had happened -- Velez told him not to worry about it; that it was none of his business.  Leopold did not pursue the matter -- he did not want to hear any more. If he did not ask any questions, maybe he would not get in any trouble, Leopold thought.  Detrinidad's car was leaving the parking lot; Velez followed him out with Leopold's car.

Velez drove to Tung's house with Leopold.  Along the way, as they crossed the San Mateo Bridge, Velez threw a beanie cap he had been wearing out the window into the water.  Detrinidad also appeared at Tung's house.  Velez brought the Ruger in, wrapped in something.  The space they stood in was small, so he handed the gun to Leopold, who passed it on to Tung at Velez's instruction. Leopold denied telling Tung to get rid of the gun -- it was not his weapon, so it was not his place to say something like that.  He watched Tung open the revolver, remove the shells and toss them in the trash.  Velez, Leopold and Tung then saw that Detrinidad had emptied 16 baggies of marijuana on the kitchen table.  Velez took the baggies away in a large plastic garbage bag.  Leopold may have held the bag open so that Velez could drop the smaller bags inside.  Then, Velez drove Leopold's car back to Velez's house with Leopold.

Leopold told Velez that if he got Leopold involved in whatever took place, he would "beat the shit out of him."  The next day, he saw Detrinidad and told him the same thing.[11]  Later, he became aware that Velez had been arrested. He also learned that the police were looking for him.  Scared, he sought the advice of an attorney and turned himself in to police.  He was arrested.  Leopold was told that he had to participate in a lineup.  He had a hard time finding people to fill in the other places in the lineup.

People v. Leopold, No. A084798, slip op. at 1-11 (Cal. Ct. App. May 31, 2000) (Resp't Ex. C)

(footnotes renumbered).

_____

[11]  Detrinidad denied that Leopold threatened him if he involved Leopold in the shooting.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

**DISCUSSION**

I.   **Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); cf. Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "[Section] 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Williams, 529 U.S. at 412.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

10

United States District Court

For the Northern District of California

Williams, 529 U.S. at 411.  The objectively unreasonable-standard is not a clear error standard.
Lockyer v. Andrade, 538 U. S. 63, 75-76 (2003) (rejecting Van Tran's use of "clear error"
standard); Clark v. Murphy, 331 F.3d 1062, 1067-69 (9th Cir. 2003), cert. denied, 540 U.S. 968
(2003) (acknowledging the overruling of Van Tran on this point).  After Lockyer, "[t]he writ
may not issue simply because, in our determination, a state court's application of federal law
was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is not self-
explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the
Ninth Circuit] ha[s] previously afforded them."  Clark, 331 F.3d at 1068.

     A federal habeas court may grant the writ if it concludes that the state court's
adjudication of the claim "resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28
U.S.C. § 2254(d)(2).  A district court must presume correct any determination of a factual issue
made by a state court unless the petitioner rebuts the presumption of correctness by clear and
convincing evidence.  28 U.S.C. § 2254(e)(1).  This presumption is not altered by the fact that
the finding was made by a state court of appeals, rather than by a state trial court.  Sumner v.
Mata, 449 U.S. 539, 546-47 (1981); Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001),
amended, 253 F.3d 1150 (9th Cir. 2001).

     As to Petitioner's first claim, where the California Supreme Court denied review of
Petitioner's claim without explanation, the Court looks to the last reasoned state court decision
in conducting habeas review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 & n.2 (9th Cir.
2000) (citation omitted), cert. denied, 534 U.S. 944 (2001) (the district court "looks through"
the unexplained California Supreme Court decision to the last reasoned state court decision).  In
the instant case, the California Court of Appeal rendered the last reasoned state court decision
on Petitioner's first claim.

     As to Petitioner's other claims, the standard of review under the AEDPA is somewhat
different where the state court failed to issue a reasoned decision.  In such a case, a review of
the record is the only means of deciding whether a state court's decision was objectively

reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002); Bailey v. Newland, 263 F.3d 1022, 1028 (9th Cir. 2001); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Himes, 336 F.3d at 853; Delgado, 223 F3d at 982; accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).  The federal court need not otherwise defer to the state court decision under the AEDPA: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect.  If there is no such decision on the merits, however, there is nothing to which to defer." Greene, 288 F.3d at 1089.  In sum, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001); abrogated on other grounds, 537 U.S. 3 (2002).  Therefore the Court will conduct an independent review of the record as to the to claims two and three in order to determine if the state court's decision was objectively reasonable.  See Himes, 336 F.3d at 853.

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-96 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual" prejudice. Brecht, 507 U.S. at 637.

//

## II.    **Legal Claims**

Petitioner raises four claims for relief under § 2254: (A) the trial court violated his due process rights when it admitted the guilty pleas of his two co-defendants (Claim 1); (B) the appellate court erred in failing to grant his motion for augmentation (Claim 2); (C) ineffective

12

assistance of trial counsel because his trial counsel failed to object to the admittance of the guilty pleas and to request any limiting jury instructions in relation to the guilty pleas (Claim 3); and (D) ineffective assistance of appellate counsel (Claim 4).  (Second Am. Pet. at 6-7.)

### A.     Due Process Violations

Petitioner claims that the joint trial of Petitioner with his co-defendants resulted in a denial of due process because the state introduced the guilty pleas of both co-defendants.  (Id. at 6.) Petitioner also claims that the trial court violated his due process rights when it failed to give limiting instructions as to the guilty pleas of the co-defendants.  (Id.)  Finally, Petitioner raises for the first time in his Traverse that the trial court violated his due process rights under the Confrontation Clause of the Sixth Amendment.  (Traverse at 3.)

### 1.     Trial Court Erred in Admitting the Guilty Pleas of Two Co-Defendants

#### a.     Background

Petitioner claims that the joint trial of Petitioner and his two co-defendants, who both eventually pled guilty, violated his due process rights.  (Second Am. Pet. at 4-6.)  He alleges that this trial was rendered fundamentally unfair because the jury learned that both co-defendants had entered guilty pleas when the prosecutor called one of the co-defendants, Detrinidad, to testify.  RT 939.

The appellate court summarized the facts and standard of review as follows:

> In his sole ground for appeal, Leopold contends that his joint trial with his two [co-defendants] resulted in a denial of his due process rights when the jury was advised that Detrinidad and Velez both pled guilty at the close of the prosecution's case-in-chief.  He argues that -- regardless of the prosecutor's intentions -- the agreement entered at midtrial distorted the judicial fact-finding process and rendered his trial fundamentally unfair.[12]  Thus, Leopold contends that the trial court violated his due process rights when it denied his motion for mistrial made after Detrinidad and Velez entered their guilty pleas.  (See U.S. Const., Amend. XIV; Cal. Const., art. I, § 15.)

> The standard of review of a denial of a motion for mistrial is well established.  A motion for mistrial is addressed to the sound discretion of the trial

_____

[12]  Leopold does not raise a claim of prosecutorial misconduct either at trial or on appeal.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4

court.  It may properly be refused when the court is satisfied that no injustice has resulted or will result from the claimed error.  (*People v. Grant* (1942) 53 Cal.App.2d 286, 288; see *People v. Slocum* (1975) 52 Cal.App.3d 867, 884, cert. den. 426 U.S. 924.)  Denial of a motion for mistrial will not be disturbed on appeal unless the defendant establishes an abuse of discretion.  (*People v. Slocum*, *supra*, at p. 884; *People v. Woodberry* (1970) 10 Cal.App.3d 695, 708-709.)

5
6
7
8
9
10
11

An appellate court may reverse a conviction if a gross unfairness deprived the defendant of a fair trial or due process of law.  (See *People v. Turner* (1984) 37 Cal.3d 302, 313, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149-1150; see also *Spencer v. Texas* (1967) 385 U.S. 554, 563-564.)  Fundamental unfairness may occur even if the evidence admitted by means of the challenged procedure is true.  (*Lisenba v. California* (1941) 314 U.S. 219, 236.)  Due process guarantees that a criminal defendant will be treated with fundamental fairness.  A denial of due process requires that an absence of that fundamental fairness necessarily prevented the defendant from receiving a fair trial.  (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 872.)

12

Resp't Ex. C at 11-12 (footnotes renumbered).

13
14
15

The appellate court held that under California Penal Code § 1099[13] (hereinafter "Section 1099") and prior California Supreme Court cases, the admission of the co-defendant's guilty pleas was allowed.

16
17
18
19
20
21
22
23

The California Supreme Court has twice considered and rejected the contention now raised by Leopold.  In *People v. Terry* (1962) 57 Cal.2d 538, certiorari denied 375 U.S. 960 (*Terry*), the California Supreme Court relied on state statutory law.  In that matter, immediately before the prosecution was to complete its case-in-chief, Terry's [co-defendant] changed his plea to guilty on several counts.  After the remaining counts were dismissed, the [co-defendant] -- now protected by a grant of immunity -- testified against Terry, giving "very damaging testimony" that led to Terry's conviction for murder and subsequently, to a death sentence.  (*Terry*, *supra*, at pp. 544-545, 559.)  Terry's motion for new trial challenging the timing of the change of plea and grant of immunity -- which, he complained, came at the close of the prosecution's case

24

[13]  Section 1099 states:

25
26
27
28

Defendants jointly charged; discharge of one to be witness for people . . . [w]hen two or more defendants are included in the same accusatory pleading, the court may, at any time before the defendants have gone into their defense, on the application of the prosecuting attorney, direct any defendant to be discharged, that he may be a witness for the people.

Cal. Penal Code § 1099.

rather than at the beginning of trial -- was denied.  (*Id.* at pp. 559-560.)

Terry contended in his appeal that this procedure constituted a conspiracy between the prosecutor, the [co-defendant] and the [co-defendant's] counsel.  His [co-defendant] was an accomplice whose testimony had to be corroborated, Terry reasoned.  As his [co-defendant] sat in the courtroom through the presentation of the prosecution's other witnesses, Terry argued, he had the benefit of hearing the prosecution's case and tailoring his testimony such that the prior witnesses corroborated him, thus strengthening the prosecution's case.  (*Terry*, *supra*, 57 Cal.2d at p. 559.)

However, the California Supreme Court ruled that the [co-defendant] was properly permitted to testify.  (*Terry*, *supra*, 57 Cal.2d at pp. 559-560.)  It noted that the [co-defendant] testified before the defense began, after the prosecution against him had been resolved.  He testified that he had not been promised any reward for his change of plea, nor had he been threatened or coerced.  (*Id.* at p. 559.)  He testified that he did not decide to change his plea until a few minutes before he did so.  The trial court noted that the [co-defendant's] counsel had put up a spirited defense as the prosecution unfolded its case.  It found no evidence to indicate any conspiracy between the People and the [co-defendant] or his counsel.  (*Id.* at p. 560.)

In *Terry*, the People argued that [S]ection 1099 specifically permitted the admission of the [co-defendant's] testimony.  (*Terry*, *supra*, 57 Cal.2d at p. 559.)  That statute provides that when two or more defendants are accused in the same information, the court may -- at any time before the defendants begin their defense, at the prosecutor's request -- direct any defendant to be discharged in order that he or she may be a prosecution witness.  (§ 1099.)  The California Supreme Court concluded that the language of this provision necessarily implies that the [co-defendant] be present at trial before the charges are discharged.  "[I]t would completely nullify the purpose of [Section 1099] if the fact that [the co-defendant] had heard the testimony of other witnesses would disqualify him from testifying."  (*Terry*, *supra*, at p. 560.)  The state's high court also rejected the claim that because the [co-defendant] pled guilty to some of the charges, this provision did not permit him to testify.  Finally, it concluded that the credibility of the [co-defendant's] testimony was properly a question for the jury to resolve. (*Ibid.*)

In *People v. Roberts* (1966) 65 Cal.2d 514, the California Supreme Court considered a similar claim, made on both statutory and constitutional grounds.  In *Roberts*, the defendant claimed that the dismissal of the charges against his [co-defendant] before their third trial on murder charges began denied him a fair trial under the federal and state Constitutions.  (*Id.* at p. 518.)  The state's high court rejected this claim of error -- which it characterized as one of prosecutorial misconduct -- ruling that for the prosecutor to avail himself of the provisions of [S]ection 1099 was proper.  (*Id.* at pp. 518-519.)  Thus, the

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

California Supreme Court has ruled that the use of the procedure set forth in [S]ection 1099 does not violate due process. (See U.S. Const., Amend. XIV; Cal. Const., art. I, § 15.)

Id. at 12-14.

### b.    Applicable Federal Law

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A state court's evidentiary ruling therefore is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986).

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986), cert. denied, 479 U.S. 839 (1986). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. See Henry,197 F.3d at 1031; Jammal, 926 F.2d at 919. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. See id. (citing Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990.

### c.    Analysis

16

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Petitioner alleges that the trial court erred in denying him a motion for mistrial because the joint trial of Petitioner and his co-defendants resulted in a denial of due process when testimony was admitted into evidence that both co-defendants had entered guilty pleas.  (Second Am. Pet. at 6.)  Petitioner also contends that a co-defendant in a joint trial may not testify that another non-testifying co-defendant also changed his plea.  (Id.)

Respondent argues that the California Supreme Court has long held that Section 1099 does not violate the due process clause and that it expressly permits co-defendants to become state witnesses before the close of the prosecution's case.  (Answer at 12 [citing Roberts, 65 Cal.2d at 514].)  Respondent points out that Petitioner cites to no relevant authority that supports the contention that a co-defendant in a joint trial may not change his plea and later testify for the prosecution against any remaining co-defendants.  (Id. at 13.)

The appellate court rejected Petitioner's contention, finding that the trial court properly denied his motion for a mistrial under California law and that Petitioner had not proven that the trial court abused its discretion in denying the motion:

> In Leopold's case, the People . . . relied on [S]ection 1099 when it successfully defended against his motion for mistrial.  The trial court rejected his claim that to continue the trial would result in a fundamental unfairness.  On the authority of [S]ection 1099 and the California Supreme Court cases approving its application, we conclude that Leopold has not established that the trial court abused its discretion when denying his motion for mistrial.

Resp't Ex. C at 14.

The Court finds that Section 1099 has become a well established principle of California case law.  Terry, 57 Cal.2d at 559-60 (holding that Section 1099 explicitly permits a co-defendant to change his plea and testify for the prosecution before the defense has begun their case).

Here, Detrinidad's testimony was properly permitted under Section 1099.  At the time the co-defendants entered their guilty pleas and Detrinidad took the stand for the state under direct examination, the prosecution's case had not ended.  The Court finds that the state court's reliance on California Supreme Court precedence in determining that the trial court correctly

17

1  applied Section 1099 is not "contrary to" or "an unreasonable application of" clearly established

2  federal law.  28 U.S.C. § 2254 (d)(1).

3      Even if the admittance of Detrinidad's testimony about the guilty pleas was wholly

4  authorized under Section 1099, Petitioner argues that the admittance of the guilty pleas of the

5  co-defendants denied him due process because he was not given a fair trial.  (Second Am. Pet.

6  at 6.)

7      Fundamental unfairness may occur even if the evidence is admitted by means of the

8  challenged procedure is true.  Lisenba v. California, 314 U.S. 219, 236 (1941).  A state law will

9  violate due process if it "offends some principle of justice so rooted in the traditions and

10  conscience of our people as to be ranked as fundamental."  Montana v. Egelhoff, 518 U.S. 37,

11  43 (1996) (citing Patterson v. New York, 432 U.S. 197, 201-202 (1977)).

12      Respondent argues that the admission of the guilty pleas did not render the trial

13  fundamentally unfair, but instead it allowed Petitioner's trial counsel to use the admission to

14  further strengthen the defense.  (Answer at 15.)  Respondent alleges that the guilty pleas in fact

15  "demonstrated the prosecution was concerned about the weakness of its case."  (Id. at 14.)

16  Petitioner's trial counsel argued this exact point during his closing statement:

17

18          I want you to go back in time to Thursday, July 23rd, when you left this
        courtroom and there were three defendants at this table.  By then you knew the
19          prosecution's case consisted of the evidence of Mr. Birdi and Mr. Tung.  He said
        that on July 14th in his opening statement.  [¶]  If Mr. Moore [the prosecutor]
20          thought his case was so good he wouldn't have spent an hour with Mr. Birdi this
        morning telling you all the details of an excellent eyewitness he was.  If he
21          thought his case was so good he would not have given Mr. Detrinidad and Mr.
        Velez a 16-year deal and put them on the stand.  He knew there were flaws in his
22          case, he knew, he looked at you.  If this case was submitted to you at that time
        and place you would have acquitted.  That's why he made the deal with Mr.
23          Detrinidad.

24

25  RT 1235-1236.

26      Respondent further argues that the guilty pleas also allowed the defense to bolster the

27  theory that Petitioner was being set up as the "fall guy."  (Answer at 14.)  Petitioner's trial

28  counsel also used this argument at his closing:

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10

> The dilemma I face is the stronger I made my case on behalf of my client it increased the odds of the prosecution offering a deal to Velez and Detrinidad.  I went forward and that's what happened.  [¶]  And what's the deal?  16 years on a manslaughter.  What's the proviso on the deal?  You tell the truth.  What's the truth?  Who's to determine the truth?  With all due respect to Judge Jay, he may be a fine jurist, but he's just a man.  You have the charge of determining the facts in this case and the truth in this case.  [¶]  Mr. Detrinidad didn't know what the truth was, and offering that kind of a deal to me is one of the highest points of cynicism because when a prosecutor puts a person on the stand, if he gives that person immunity the prosecution is fearful that that person may not testify as they have given a statement previously and may confess to the crime themselves and get somebody off the hook. . . . So here an individual has a deal, 16 years, the best he could get, and he had to tell the same story he told the cops and at that point it's obvious that the prosecution is seeking to buttress their case against one individual and that's my client.

11   RT 1258-1259.

12

13   Finally, Respondent claims that Petitioner was "benefitted" from finding out that Velez

14   had also pleaded guilty because, "[t]his fact enabled counsel to make the argument that the

15   prosecutor was afraid to have the jury hear the testimony from Velez."  (Answer at 15.)

16   Petitioner's trial counsel argued:

> The prosecution did not choose to call Mr. Velez either in his case in chief or in rebuttal.  His honor will instruct you that no side is obligated to call all witnesses.  [¶]  But I think you have to concern yourself with a couple factors.  Why did Mr. Moore choose not to call Mr. Velez?  Was he afraid that you might hear him speak and buttress my argument?  Was he afraid that Mr. Velez would contradict Mr. Detrinidad and say something else or shift the responsibility?  Or because he felt he didn't need him?

17
18
19
20

21   RT 1260.

22   The Court agrees with Respondent's assessment that a defense counsel may use a tactical

23   decision to purposely refrain from objecting to the admission of guilty pleas.[14]  In sum,

24   Respondent argues that "it is not always necessary to protect a defendant by precluding the jury

25   from learning of a non-testifying co-defendant's guilty plea or to limit their consideration of the

26   evidence."  (Answer at 16, n.14.)  Furthermore, the Court has previously found that Section

27
28

----

[14] The Court will address Petitioner's ineffective assistance of trial counsel claim based on the trial counsel's failure to object to the admittance of the guilty pleas and failure to request limiting jury instructions regarding the those pleas.  See infra Discussion Part II.C.

19

United States District Court

For the Northern District of California

1099 is not contrary to clearly established federal law, thus Petitioner could not have been denied a fundamentally fair trial.  <u>Montana</u>, 518 U.S. at 43.  The trial court's admission of the guilty pleas of both co-defendants, under Section 1099, and its eventual denial of Petitioner's motion for a new trial did not inhibit Petitioner from pursuing his ongoing argument that he had been labeled as the "fall guy."  (Answer at 14.)

Therefore, Petitioner is not entitled to federal habeas relief on the claim that the trial court erred in admitting the guilty pleas of his co-defendants.

### 2.   <u>Failure to Give Limiting Jury Instructions</u>

#### a.   <u>Background</u>

Petitioner claims that his due process rights were violated when trial court allowed the prosecution to introduce the guilty plea of co-defendant Velez as substantive evidence of Petitioner's own guilt, without giving any limiting jury instructions and without even having the prosecution call the co-defendant Velez as a witness.  (Second Am. Pet. at 5.)  The appellate court did not explicitly address Petitioner's contention that the failure to give limiting instructions (as to the admission of the guilty pleas of his co-defendants) violated due process.[15]

#### b.   <u>Applicable Federal Law</u>

A state trial court's failure to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings.  <u>See</u> <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988).  The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  <u>See</u> <u>Walker v. Endell</u>, 850 F.2d 470, 475-76 (9th Cir, 1987).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997) (quoting <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977)).

#### c.   <u>Analysis</u>

In his Traverse, Petitioner argues that it is a well accepted principle that the "admissions by jointly tried defendant which are inculpatory to his or her co-defendant cannot be considered

---

[15]  Although Petitioner failed to exhaust this claim, the Court may deny an unexhausted claim on the merits.  <u>See</u> 28 U.S.C. § 2254 (b)(2).

20

as evidence of the co-defendant's guilt." (Traverse at 5.)  Petitioner further argues that because

of the "highly prejudicial nature of a co-defendant's guilty plea, trial courts are required to give

limiting instructions which will ensure the jury does not use the co-defendant's guilty plea as

substantive evidence of a defendant's guilt."  (Id. at 6.)

Respondent argues one possible reason for Petitioner's trial counsel's failure to make any

objections, stating that:

> [Defense] counsel has clear tactical reasons not to seek limiting
> instructions on the admission of these guilty pleas.  To begin, had counsel
> sought a limiting instruction regarding Velez's plea, i.e., that it could only be
> considered for purposes of assessing his credibility as a witness . . . .  More
> significantly, however, counsel had no need to seek such a limiting instruction.
> As indicated . . . the defenses were antagonistic; that any co-defendant pleaded
> guilty was not a fact that incriminated [P]etitioner.  To the contrary, it only
> confirmed [P]etitioner's defense that those co-defendants committed the crimes
> charge[d], not him.

(Answer at 17.)

The Court finds that Petitioner relies on authority that is contrary to the facts of his case,

when he mentions that there are "a number of federal court decisions that hold 'the guilty plea or

conviction of a co-defendant may not be offered by the government and received over

objections as substantive evidence of the guilt of those on trial.'"  (Traverse at 5 [citing Halbert,

640 F.2d at  1004].)  The holding in Halbert clearly refers to an instance where defense counsel

has raised objections.  See Halbert, F.2d at 1004.  Here, Petitioner's trial counsel made no

objections over the admission of guilty pleas of the co-defendants and failed to ask the trial

court for limiting instructions.  The Court finds that Petitioner has not met the "heavy burden"

that a habeas petitioner must overcome when the claim involves a failure to give a particular

limiting instruction.  Villafuerte, 111 F.3d at 624.

Therefore, Petitioner is not entitled to federal habeas relief on his claim that the trial

court failed to give limiting instructions.

### 3.    Confrontation Clause Violation

#### a.    Background

21

1    In his Traverse, Petitioner alleges that his due process rights were violated under the

2   Confrontation Clause because co-defendant Velez did not take the witness stand.  (Traverse at

3   3.)[16]

4   **b.    Applicable Federal Law**

5    The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

6   accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.

7   The federal confrontation right applies to the states through the Fourteenth Amendment.  See

8   Pointer v. Texas, 380 U.S. 400, 403 (1965).

9    The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it

10  is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61

11  (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a

12  particular manner -- by testing in the crucible of cross-examination.  Id.; see Davis v. Alaska,

13  415 U.S. 308, 315 (1974) (a primary interest secured by the Confrontation Clause is the right of

14  cross-examination).  The Confrontation Clause thus reflects a judgment, not only about the

15  desirability of reliable evidence, but about how reliability can best be determined.  Crawford,

16  541 U.S. at 61; see, e.g., United States v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998)

17  (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing

18  witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of

19  witnesses).  The Confrontation Clause applies to all "testimonial" statements.  See Crawford,

20  541 U.S. at 51.  "Testimony . . . is typically a solemn declaration or affirmation made for the

21  purpose of establishing or proving some fact."  Id. at 51 (citations and quotation marks omitted).

22   Confrontation Clause claims are subject to harmless error analysis.  United States v.

23  Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case); see also United States v.

24  Allen, 425 F.3d 1231,1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the

25

26

27  _____

    [16]  A traverse is not the proper pleading to raise additional grounds for relief, therefore, issues

28  raised for the first time in a traverse should not be considered.  See Cacoperdo, 37 F.3d at 507-08.
    Furthermore, Petitioner has not exhausted this claim in state court.  Ignoring the procedural
    deficiencies of his claims, the Court will still address the merits of this claim.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    standard applicable to violations of the Confrontation Clause is whether the inadmissible

2    evidence had an actual and prejudicial effect upon the jury.  See Hernandez v. Small, 282 F.3d

3    1132, 1144 (9th Cir. 2002) (citing Brecht, 507 U.S. at  637); Webb v. Lewis, 44 F.3d 1387,

4    1393 (9th Circ. 1994).[17]  The standard on direct review of federal criminal convictions is

5    "harmless beyond a reasonable doubt."  Nielsen, 371 F.3d at 581.

6         Federal courts formerly applied the Chapman harmless error standard to all criminal

7    convictions tainted by trial error.  Under this test "before a federal constitutional error can be

8    harmless, the court must be able to declare a belief that it was harmless beyond a reasonable

9    doubt." Chapman v. California, 386 U.S. 18, 24 (1967).  While the Chapman standard remains

10   applicable to criminal convictions challenged on direct appeal, the Supreme Court has adopted a

11   less strict standard for federal habeas corpus.  See Brecht, 507 U.S. at 637-38.  A habeas

12   petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or

13   influence in determining the jury's verdict.'"  Id. at 637 (quoting Kotteakos v. United States, 328

14   U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain

15   plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless

16   the error resulted in "actual prejudice."  Id. (citation omitted).[18]

17        The proper question in assessing harm in a habeas case is, "'Do I, the judge, think that

18   the error substantially influenced the jury's decision?'"  O'Neal v. McAninch, 513 U.S. 432, 436

19   (1995).  If the court is convinced that the error did not influence the jury, or had but very slight

20   effect, the verdict and the judgment should stand.  Id. at 437.  If, on the other hand, the court is

21

22        [17]  If the state court disposed of a constitutional error as harmless under an appropriate
23   standard of review, federal courts must, for purposes of application of the "unreasonable
     application" clause of 28 U.S.C. § 2254(d)(1), first determine whether the state court's harmless
24   error analysis was objectively unreasonable.  Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004).
     If the federal court determines that the state court's harmless error analysis was objectively
25   unreasonable, and thus an unreasonable application of clearly established federal law, the federal
     court then proceeds to the Brecht analysis.  Id. at 877.  Analysis under the "contrary to" clause of 28
26   U.S.C. § 2254(d)(1) is not affected by this rule.  Id.

27
          [18]  The Brecht standard for actual prejudice is synonymous with that used in federal direct
28   appeal cases for finding plain error which affected substantial rights.  Lee v. Marshall, 42 F.3d 1296,
     1298-99 (9th Cir. 1994).

23

1    not fairly assured that there was no effect on the verdict, it must reverse. Id. In the "narrow

2    circumstance" in which the court is in "grave doubt" about whether the error had substantial and

3    injurious effect or influence in determining the jury's verdict, it must assume that the error is not

4    harmless and petitioner must win. Id. at 436, 438; see, e.g., id. at 436-44 (relief granted because

5    record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error).

6        A federal habeas court reviewing the prejudicial effect of constitutional trial error does

7    not simply examine whether there was sufficient evidence to support the conviction in the

8    absence of constitutional error. Rather, regardless whether there is sufficient evidence to

9    support the conviction apart from the error, the court must determine whether the error had a

10   substantial and injurious effect or influence on the conviction. If it did, the court must set aside

11   the conviction. Ghent v. Woodford, 279 F.3d 1121, 1127 (9th Cir. 2002).

12       A trial error is considered harmless under Brecht only if the actual jury in the case

13   would have reached the same verdict absent the error. Gray v. Klauser, 282 F. 3d 633, 654-55

14   (9th Cir. 2002), judgment vacated on other grounds, 537 U.S. 1041 (2002) (emphasis in

15   original). Therefore, a court must not go beyond the record in deciding the likely effect if the

16   error had not occurred. Id. at 655.

17       Although the Eighth Circuit has held that when the state court did not have the

18   opportunity to review the error at all and the federal habeas court is the first to review the

19   constitutional error, the appropriate harmless error test may be the Chapman standard, Orndorff

20   v. Lockhart, 998 F.2d 1426, 1430 (8th Cir. 1993), the Ninth Circuit has rejected that conclusion

21   and held that the Brecht standard applies uniformly in all federal habeas corpus cases under

22   § 2254. Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000), cert. denied, 531 U.S. 1037

23   (2000).

24                            c.    **Analysis**

25       Petitioner argues that the Confrontation Clause prevents the government from seeking to

26   "convict a defendant by introducing evidence that a non-testifying co-defendant in the case has

27   admitted guilt and implicated the defendant." (Traverse at 3 [citing Lee v. Illinois, 476 U.S.

28

24

**United States District Court**
For the Northern District of California

530, 546 (1989)].)  Petitioner contends that the prosecutor "elicited" Velez's guilty plea during the direct examination of Detrinida.  (Id.)  Petitioner also asserts that the Confrontation Clause requires that "evidence against an accused must come from the witness stand in a manner that permits a defendant to confront his accusers."  (Id. [citing Turner v. Louisiana, 379 U.S. 466, 472-73 (1965)].)

The Confrontation Clause ensures the right to cross-examine "testimonial" statements. See Crawford, 541 U.S. at 51.  Here, the admittance of the guilty pleas came from Detrinidad's testimony.  RT 939.  The Court finds that there was no due process violation because any inculpatory testimony came from Detrinidad's direct examination and Petitioner was not prevented in any way from cross-examining and confronting Detrinidad.

Even if the Court found that the admission of the non-testifying co-defendant's guilty plea constituted a constitutional error, this alleged error was harmless.  In the context of a federal court reviewing a state conviction in a habeas petition, the error must have had an "actual and prejudicial effect upon the jury."  Hernandez, 282 F.3d at 1144.

Petitioner argues that the error was not harmless because the jury deliberations took considerable time.  (Traverse at 8.)  Petitioner makes an inferential leap in concluding that the time length of the jury deliberations "indicates a close call."  (Id. [citing Mayfield v. Woodford, 270 F.3d 915, 921 (9th Cir. 2001) (en banc)].)  However, the holding in Mayfield is fact specific and does not stand for the general proposition that a long jury deliberation automatically indicates a "close call."  (Id.)

Petitioner further argues that the error was not harmless because the jury had requested a copy of the "direct examination of Detrinidad in which he elicited that both Detrinidad and Velez had pled guilty."  (Id. at 8.)  Petitioner therefore infers that the admission of the non-testifying co-defendant's guilty plea had an "actual and prejudicial effect upon the jury." Hernandez, 282 F.3d at 1144.

Respondent argues that the only inculpatory testimony by a co-defendant came from the witness stand, and Petitioner was able to confront and cross-examine him.  (Answer at 16.)

25

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respondent reasons that Velez's "admission of guilt did not incriminate petitioner; if anything, his admission of guilt was exculpatory or neutral to [P]etitioner's defense." (Id. at 17.)

The Court finds that the admission of Velez's guilty plea did not have "actual and prejudicial effect upon the jury." Hernandez, 282 F.3d at 1144. The defense counsel effectively argued that Velez entered into a favorable negotiated plea bargain and yet did not testify for the prosecution. RT 1260. The defense counsel made a persuasive argument that Velez's admission of a guilty plea should be viewed as bolstering the defense's view of events because not testifying showed that the prosecution was afraid that Velez's testimony may be exculpatory. RT 1258-1260. Taking into consideration the defense's strategy and argument that Velez did not testify even after being given a plea bargain because his testimony would have been exculpatory, the actual jury would have reached the same verdict even without the admission of Velez's guilty plea. Therefore the alleged error of admitting the co-defendants guilty pleas is harmless under Brecht because it did not have an "actual and prejudicial effect upon the jury." Hernandez, 282 F.3d at 1144. Even on the merits, this Confrontation Clause claim is denied.

Accordingly, for the foregoing reasons, Petitioner is not entitled to habeas relief on his claim of due process violations based on: (1) the trial court's erroneous admittance of the guilty pleas of the two co-defendants; (2) its failure to give limiting instructions; and (3) the confrontation clause violation.

//

**B.**   **Augmentation of Transcript**

**1.**   **Background**

Petitioner argues that the appellate court violated his rights to due process and equal protection because it refused to augment the record to include a complete transcript of the jury voir dire. (Second Am. Pet. at 6-7.)[19] Petitioner contends that he has a right to the entire voir

---

[19] Petitioner's claim of ineffective assistance of appellate counsel stems from the allegation that the appellate court's denial of Petitioner's request for augmentation to include the entire transcript of the voir dire precluded the appellate counsel from presenting all potentially meritorious

26

1    dire transcript as a matter of right.  (Id.)

2          The motion for augmentation was granted in part and denied in part.  See Resp't Ex. E,

3    Cal. Ct. App. Order dated Feb. 5, 1999 at 1.  The appellate court granted the motion for

4    augmentation in connection with the voir dire transcript for the following dates: June 17, 1998;

5    June 29, 1998; July 6, 1998; July 7, 1998; and July 8, 1998.  Id.  The appellate court gave no

6    reasoning as to the denial of the motion for augmentation as to the other portions of the voir dire

7    transcript.  Id.

8                    2.      **Applicable Federal Law**

9          A court need only provide an indigent defendant with "a record of sufficient

10   completeness" to prepare an appeal; irrelevant or extraneous portions of the transcript may be

11   omitted.  Mayer v. City of Chicago, 404 U.S. 189, 194-95 (1971).  Statutes or rules requiring an

12   indigent defendant to show a specific need for an entire trial transcript do not run counter to

13   clearly established federal law.  See Boyd v. Newland, 393 F.3d 1008, 1016 (9th Cir. 2004).

14   (California rule requiring an indigent defendant to show a specific need to a complete voir dire

15   transcript does not violate clearly established federal law); see also United States v.

16   MacCollom, 426 U.S. 317, 324-25 (1976) (plurality opinion) (provision of 28 U.S.C.§ 753(f),

17   regarding transcripts for use in cases under 28 U.S.C. § 2255, and requiring judge to certify that

18   case is not frivolous and that transcript is needed before transcript is prepared at government

19   expense, does not violate equal protection or due process).

20

21                   3.      **Analysis**

22         Petitioner argues that, as an indigent prisoner, he was entitled to an entire trial transcript

23   as a matter of right.  (Second Am. Pet. at 6.)  "The state must provide an indigent defendant

24   with a transcript of prior proceedings when that transcript is needed for an effective defense or

25   appeal."  See Britt v. North Carolina, 404 U.S. 226, 227 (1971); see also Kennedy v. Lockyer,

26   379 F.3d 1041, 1057 (9th Cir. 2004) (holding that clearly established Supreme Court precedent

27   requires the state to provide an indigent defendant with a full transcript of the entire trial court

28

issues on appeal.  See infra Discussion Part II.D.

**United States District Court**
For the Northern District of California

1    proceeding for use in a second trial).  Under California law an indigent defendant is required to

2    "establish with some certainty how the requested materials may be useful on appeal" before a

3    transcript is provided free of charge.  Cal. Ct. App., First App. Dist. Local Rule 6(d) (2003)

4    (hereinafter "Local Rule 6(d)").[20]  If the defendant seeks augmentation of the record concerning

5    a Wheeler motion[21] that was denied during voir dire, the defendant is entitled to augmentation

6    of only those portions of the voir dire that are relevant to the Wheeler motion, and not to the

7    entire voir dire.  Boyd, 393 F.3d at 1016.

8            Petitioner reasons that the entire voir dire transcript was necessary: (1) to evaluate

9    the prosecutor's race neutral reasons in regards to his Wheeler challenge; (2) to protect

10   Petitioner's federal and state constitutional rights to an adequate appellate review; and (3) to

11   protect Petitioner's federal and state constitutional rights to effective assistance of counsel on

12   appeal.  See Resp't Ex. E at 6.

13           In his Traverse, Petitioner argues that "in the face of a specific showing" of need, the

14   failure to provide a complete "augmented recorded" of the voir dire "was contrary to and an

15   unreasonable application of Supreme Court authority."  (Traverse at 12.)  However, Petitioner's

16   arguments do not show that the appellate court's decision is objectively unreasonable.  See 28

17   U.S.C. § 2254(d)(2); cf. Williams, 529 U.S. at 409 (federal court making "unreasonable

18   application" inquiry under § 2254(d)(1) should ask whether the state court's application of

19   clearly established federal law was "objectively unreasonable").

20

21   _____

22       [20]  Local Rule 6(d) states:

23           A motion to augment the reporter's transcript shall identify the portion of the
             record with specificity, including the reporter and date of hearing.  It shall
24           establish with some certainty how the requested materials may be useful on
             appeal.  Requests for jury voir dire should specify the exact questioning by
25           which counsel of which juror together with the reason justifying the request.

26   Cal. Ct. App., First App. Dist. Local Rule 6(d) (2003).

27       [21]  In California, a party who believes his opponent is using his peremptory challenges to
     strike jurors on grounds of group bias alone may raise the point by way of a timely Wheeler motion.
28   See People v. Wheeler, 22 Cal. 3d 258, 280 (1978).

Local Rule 6(b) does not run counter to clearly established federal law.  Boyd, 393 F.3d at 1016.  No Supreme Court authority compels a state court to provide an indigent defendant with the entire voir dire transcript in the absence of a good reason for it.  Id. at 1016.  Therefore, the appellate court's decision to deny Petitioner's motion to include the entire voir dire transcript is not "contrary to" or "an unreasonable application of" clearly established federal law, as determined by the Supreme Court of the United States.  See 28 U.S.C. § 2254 (d)(1).

Petitioner is not entitled, as a matter of right, to an entire trial transcript and the Court must defer to the appellate court's decision in denying the augmentation request.  Accordingly, Petitioner's claim for habeas relief is denied as to this claim.

### C.    Ineffective Assistance of Trial Counsel

#### 1.    Background

Petitioner contends that he received ineffective assistance of counsel at both the trial and appellate level.  (Second Am. Pet. at 6-7.)  Petitioner argues that his trial counsel's failure to object to the admittance of his co-defendant's guilty pleas and to request limiting jury instructions violated Petitioner's right to effective assistance of trial counsel.  (Id.)

#### 2.    Applicable Federal Law

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  The right to effective assistance counsel applies to the performance of both retained and appointed counsel without distinction.  See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.

29

**United States District Court**
For the Northern District of California

1    <u>Strickland</u>, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's

2    deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

3    unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  A

4    reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u>

5            The <u>Strickland</u> framework for analyzing ineffective assistance of counsel claims is

6    considered to be "clearly established Federal law, as determined by the Supreme Court of the

7    United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  <u>See</u> <u>Williams</u>, 529 U.S. at 404-

8    08.

9                            **3.       Analysis**

10           Petitioner argues that he was denied the assistance of trial counsel to the extent his trial

11   counsel failed properly to object to the admittance of the co-defendant's guilty pleas and his

12   failure to request limiting instructions regarding the pleas.  (Second Am. Pet. at 6-7.)

13           The relevant inquiry is not what defense's trial counsel could have done, but rather

14   whether the choices made by him were reasonable.  <u>See</u> <u>Babbitt v. Calderon</u>, 151 F.3d 1170,

15   1173 (9th Cir. 1998).  Judicial scrutiny of trial counsel's performance must be highly

16   deferential, and a court must indulge a strong presumption that trial counsel's conduct falls

17   within the wide range of reasonable professional assistance.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689.

18

19           The court finds that Petitioner's trial counsel's tactical decision to allow the admittance

20   of the co-defendant's testimony did not fall below an objective standard of reasonableness.  <u>See</u>

21   <u>Strickland</u>, 466 U.S. at 688.  Tactical decisions of trial counsel deserve deference when counsel

22   in fact bases his trial conduct on strategic considerations and the decision appears reasonable

23   under the circumstances.  <u>See</u> <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994).  Here, the

24   trial counsel effectively intertwined the admittance of the co-defendant's testimony to bolster

25   the defense theory, that Petitioner had been labeled as the "fall guy."  <u>See</u> <u>supra</u> Discussion Part

26   II.A.1.c.

27           Similarly, Petitioner's trial counsel's tactical decision to refrain from requesting a

28   limiting jury instructions as to the admittance of the co-defendant's testimony did not fall below

                                        30

United States District Court
For the Northern District of California

an objective standard of reasonableness. See Strickland, 466 U.S. at 688. Petitioner's trial counsel clearly made a tactical decision in to request for a limiting jury instruction. A trial counsel has wide discretion in making tactical decisions, including foregoing jury instructions inconsistent with trial theory. See Butcher v. Marquez, 758 F.2d 373, 377 (9th Cir. 1985).[22] Had there been a limiting jury instruction, then the defense could not have made the argument that the prosecution did not allow Velez to testify because his testimony would have been exculpatory to Petitioner. See supra Discussion Part II.A.1.c.

Second, the defendant must show that trial counsel's alleged errors were so serious as to deprive the defendant of a fair trial. Strickland, 466 U.S. at 688. The test for prejudice is not outcome-determinative, i.e., the defendant need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. Id. at 693. The defendant must show that there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694.

Here, the trial counsel's failure to make any objections as to the admittance of the co-defendant's testimony and his failure to request limiting jury instructions did not prejudice Petitioner or render the trial fundamentally unfair. Failure to make evidentiary objections does not render assistance of trial counsel ineffective unless challenged errors can be shown to have prejudiced the defense. United States v. Gibson, 690 F.2d 697, 703-04 (9th Cir. 1982), cert. denied, 460 U.S. 1046 (1983). Instead, this tactical decision allowed the defense to not only bolster their main defense theory but also allowed them to present persuasive arguments that had previously been unavailable.

Therefore, the state court's rejection of Petitioner's ineffective assistance of trial counsel claim was not "contrary to" or "an unreasonable application of" clearly established federal law.

---

[22] See, e.g., Kelly v. United States, 820 F.2d 1173 (11th Cir.) (counsel's admission of defendant's guilt on charges of importation of marijuana as strategy designed to persuade jury of defendant's innocence on distribution charges reasonable, tactical trial strategy), cert. denied, 484 U.S. 966 (1987).

28 U.S.C. § 2254 (d)(1).  Accordingly, Petitioner's claim for habeas relief is denied as to this claim.

    **D.**    **Ineffective Assistance of Appellate Counsel**

        **1.**    **Background**

Petitioner argues that he received ineffective assistance of appellate counsel because the appellate court did not grant his request for augmentation in its entirety and, therefore, appellate counsel could not pursue Petitioner's Batson/Wheeler[23] claim.  (Second Am. Pet. at 6-7.)

        **2.**    **Applicable Federal Law**

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  See Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).[24]  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir. 1986).

Appellate counsel, however, does not have a constitutional duty to raise every nonfrivolous issue that a defendant wishes to raise.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller, 882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434 (footnote and citations omitted).  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason -- because he declined to raise a weak issue.  See id.

        **3.**    **Analysis**

---

    [23]  The Supreme Court held in Batson v. Kentucky, 476 U.S. 79, 89 (1986), that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race.

    [24]  Although the right to the effective assistance of counsel at trial is guaranteed to state criminal defendants by the Sixth Amendment as applied to the states through the Fourteenth, see Lucey, 469 U.S. at 392, the Sixth Amendment does not address a defendant's rights on appeal; the right to effective state appellate counsel is derived purely from the Fourteenth Amendment's due process guarantee, see id.

32

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Petitioner alleges that after the appellate court ruled on Petitioner's motion for augmentation, his appellate counsel failed to make any additional requests for transcripts or pursue his Batson/Wheeler claim.  (Second Am. Pet. at 6-7.)

Petitioner has failed to show how an absence of the entire voir dire transcript has precluded the pursuit of his Batson/Wheeler claim.  As mentioned earlier, an indigent defendant only needs to be provided with "a record of sufficient completeness" to prepare an appeal; irrelevant or extraneous portions of the transcript may be omitted.  Mayer, 404 U.S. at 194-95.  Respondent points out that even though Petitioner may not have clearly established a specific need under Local Rule 6(d), the record was augmented to include the first and last day of voir dire and the days on which Petitioner's Wheeler motions were made.  (Answer at 21.)

Though it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish incompetence under the first prong, the Court will analyze the second prong.  See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).  Where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'"  Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 695).

Even if Petitioner did not have the entire voir dire transcript and his appellate counsel failed to raise his Batson/Wheeler claim, Petitioner was not prejudiced.  The appellate counsel does not have the constitutional duty to raise every non-frivolous issue on appeal.  Therefore appellate counsel will frequently remain above an objective standard of competence and have caused his clients no prejudice for the reason that he declined to raise a weak issue.  Miller, 882 F.2d at 1434 n.10.

Furthermore, Petitioner's appellate counsel had enough information to make a Batson/Wheeler claim, therefore, the appellate counsel's actions did not fall below the objective standard of reasonableness.  The Court finds it reasonable to imply that the appellate counsel made a tactical decision by not raising a weak Batson/Wheeler claim.  The trial court found a

33

United States District Court

For the Northern District of California

prima facie case that the prosecutor had used his peremptory challenges in a racially offensive manner.  RT 1911.  If the defendant establishes a prima facie case, "the burden shifts to the state to articulate a race-neutral explanation for the peremptory challenge."  Paulino v. Castro, 371 F.3d 1083, 1089 (9th Cir. 2004).  "Only then, the trial court must determine whether the defendant has established purposeful discrimination."  Id.  "A reviewing court ordinarily should give [the trial court's] findings" great deference in the context of deciding, at the final step of the analysis, whether the defendant has established purposeful discrimination.  Batson, 476 U.S. at 98.  In the instant case, the trial court accepted the prosecutor's race-neutral reasons for his challenges.  RT 1921-1922.  The trial court's acceptance of the race-neutral reasons for the prosecutor's peremptory challenges must be given great deference.  Miller-El v. Cockrell, 537 U.S. 322, 323-24 (2003).  Therefore, the Court finds that a Batson/Wheeler claim would not have succeeded in the light of the great deference it should give to the trial court's ruling, and thus his appellate counsel's failure to make a Batson/Wheeler claim did not prejudice Petitioner.

Accordingly, Petitioner's claim of ineffective assistance of appellate counsel fails both prongs of the Strickland test.  Because Petitioner has not established that the state court's rejection of this claim was "contrary to" or "an unreasonable application of" established federal law, he is not entitled to habeas relief.  28 U.S.C. § 2254 (d)(1).

//

//

//

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: February 28, 2006

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge